**In re Kenneth Palmer OLSON, Debtor.**

**PALATINE NATIONAL BANK OF PALATINE, ILLINOIS, a national banking association, Plaintiff,**

**v.**

**Kenneth Palmer OLSON, Defendant.**

**Bankruptcy No. 3–86–2812.**

**Adv. No. 3–87–23.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

July 11, 1988.

Lonny Thomas, Maun, Green, Hayes, Simon, Johanneson & Brehl, St. Paul, Minn., for Palatine Nat. Bank.

John Lang, Lang, Pauly & Gregerson, Minneapolis, Minn., for Kenneth Olson.

### ORDER

DENNIS D. O'BRIEN, Bankruptcy Judge.

This objection to discharge and dischargeability action came on for trial January 4, 1988. Appearances were as noted in the record. The Court having considered memoranda and arguments of counsel, the testimony given at trial, and having reviewed the documentary evidence offered and received, now being fully advised in the matter, hereby makes this Order pursuant to the Federal and Local Rules of Bankruptcy Procedure.

### I.

### OVERVIEW

Kenneth Olson's career began in the family furniture business. But even as a young man, he saw his future in real estate. In 1966, at age 29, Olson became the fifth shareholder in an apartment complex development corporation known as High Site, Inc. Nine years later, he was the corporation's sole shareholder. By the summer of 1975, Olson held interests in numerous real estate ventures through stock or membership in various corporations and partnerships. At that time, he claimed to have a net worth of just over $5,000,000.00, mostly attributable to real estate related investments.

In 1976, Olson began to bury evidence of much of his interests in the investments. He created what purported to be an irrevocable trust for the benefit of his children and used it as part of a sophisticated rearrangement and manipulation of his assets and entities.

By late summer of 1978, the burial was nearly complete. Olson conveyed his homestead to Karen Strom, his second wife, shortly after their marriage on August 11, 1978. Finally, in early 1979, Olson sold Strom his stock in a corporation known as "Carlton Bloomington Dinner Theater, Inc." for $500.00. That transaction left Olson ostensibly without significant assets. It also set the stage for his pursuit and development of the most ambitious project and colossal failure of his career—the Carlton Celebrity Theater (Carlton).

The Carlton was a dinner theater that provided live entertainment by some of the more well-known celebrity entertainers in the nation. Olson developed and operated the project through Strom. The dinner theater was opened for business in September of 1980. The corporation filed a petition for relief under 11 U.S.C. Chapter 11, on June 13, 1986. The Carlton ceased operation on July 1, 1987, and the case was converted to Chapter 7 on the same day. Kenneth Olson filed a petition under Chapter 7 on October 20, 1986, scheduling nominal assets. Karen Strom filed for relief under Chapter 11 on January 20, 1987, scheduling as assets the real estate on which the Carlton sits, and the corporate

stock. High Site, Inc., filed its petition under Chapter 11 on February 21, 1986. The case was subsequently dismissed without significant equity in the estate.

The Trust had never been funded, other than nominally. The various assets in which it held interests had either been foreclosed or otherwise disposed of before the bankruptcies and the Trust ultimately had no value.

## II.

## THE TRIAL

Palatine National Bank is a creditor of Olson and some of the entities he had been openly connected with prior to 1979. The Bank had been pursuing Olson to collect its debt for many years before the bankruptcies. On October 10, 1984, judgment was entered in state court against him in favor of Palatine for $874,390.23, together with accrued interest. Subsequently, the Bank pursued Olson through post-judgment collection proceedings until the filing of his bankruptcy petition.

After Olson filed for relief under Chapter 7, Palatine sued to have his discharge barred: under § 727(a)(4)(A) for making false statements or accounts in connection with the bankruptcy case; under § 727(a)(2)(A) for removing, concealing, and transferring his property to delay and hinder his creditors within one year preceding the filing of his petition; and under § 727(a)(5) for failure to satisfactorily explain the loss of assets. Alternatively, the Bank seeks nondischargeability of its debt under § 523(a)(2)(A) on grounds that it was incurred by fraud.

Two weeks were calendared for a trial of this case that began on January 4, 1988. Palatine's witness list disclosed Plaintiff's intent to call 19 witnesses. Its exhibit list disclosed 109 exhibits to be offered. Olson's witness list disclosed Defendant's intent to call 24 witnesses. His exhibit list disclosed 12 proposed exhibits.

Plaintiff opened with a generalized statement; put 139 exhibits totalling an estimated 2,000 pages into evidence; called six witnesses (one of whom was Olson) for relatively brief testimony and rested. Testimony was completed in one-and-one-half days of sessions that began late and recessed early. Defendant did not ask a single question of any of Plaintiff's witnesses; and, although he had opened with a detailed, precise, and well-prepared statement of his own evidence, Olson called no witnesses. Defendant put 11 exhibits into evidence and rested. It was an unusual trial.

In its post-trial brief, Plaintiff explains that the shortness of the trial resulted from: a last-minute withdrawal by Defendant of foundational objections to admissibility of its documentary evidence; the fact that the documents "speak for themselves" as evidence; and, failure of the Defendant to put in a case. Actually, there were no foundational objections made to admissibility of Plaintiff's documents. Pretrial objections were made to some listed exhibits on grounds that they were not sufficiently identified to place Defendant on notice of what specific documents were intended to be offered. The remaining objections were on grounds on relevancy.

At conclusion of the Plaintiff's case, Defendant moved for judgment on grounds of failure of the evidence, arguing that it was wholly inappropriate to dump the voluminous documents into evidence without a detailed opening statement or significant testimony so as to provide something for the Defendant to defend against.[1] Plaintiff countered that this was a "documents" case; and, that the Defendant knew it was a "documents" case as well as precisely what the damning evidence was—the parties had been litigating against one another for years.

The Court was concerned, given the scope of the allegations, whether due process might require something more of the Plaintiff, especially regarding the § 727(a)(5) claim of failure to explain loss

---

1. Counsel added, as an aside and off the record, that he knew from experience that Judge Devitt would not tolerate such a procedure if the case were tried in his Court, and that this Court should not either.

or deficiency of assets. In support of his motion for judgment, Defendant observed that Olson was not asked to explain a single, significant thing by Plaintiff, either during the pendency of the bankruptcy case or in the course of this adversary proceeding, even when called for cross-examination at trial. In fact, counsel argued, the only question posed during the trial asking anyone to explain anything regarding loss of assets came from the Court and was directed at Karen Strom.[2]

The Court was surprised by the abortion of the trial and was not prepared to rule on the Defendant's motion. The Defendant was told that the matter would be taken under advisement. Thereupon he opened his case, put his exhibits into evidence, and immediately rested without calling a single witness.

Plaintiff submitted a 45–page post-trial brief discussing and arguing the documentary evidence. Defendant responded with a 22–page brief.

Palatine insists that the documents speak for themselves. But so far as they might speak of the parties' relationship and dealings with one another, the documents suggest only scenarios. They do not, standing alone, clearly and convincingly bear witness to important and controlling matters of fact.

One such scenario is that Olson created a Byzantine empire of interrelated and ever changing entities to hold constantly shifted assets in a scheme to avoid, hinder and delay creditors, including Palatine. But the documents also suggest a different scenario that is both more intriguing and probably closer to the truth. The story follows.

### III.

### A JOINT VENTURE IN DECEIT

Kenneth Olson, like many ambitious real estate investors, recognized that much money could be made quickly in an inflationary real estate market through highly leveraged deals and positions. The basic blue print for successful investment with maximum return was simple.

First, a project was needed, which consisted of the underlying real estate and its development. It was important to own and control the project. This should be accomplished with as little capital as possible, and preferably with borrowed money. Projects could be completed with funds borrowed against paper equity of the project, or its underlying real estate, created by the inflationary market itself.

Furthermore, money could actually be made during the construction phase of the project if the investor had a separate employment that could furnish services or materials necessary to the development. For instance, consider an apartment development corporation owned by two investors, one of whom also owned a furniture and carpet business, and the other, a plumbing contracting business.[3] The very construction could net the investors lucrative contracts for their other businesses. The contracts could be funded with project construction, or permanent financing, loan proceeds.

Once the project development was completed, its management would usually be by separate entity, also owned and controlled by the owners of the project. It did not matter that the project might not be a particularly good one, or whether its operation was profitable. All that was needed was a cash flow sufficient to pay operating expenses, including the management fee, and to service the mortgage debt. Equity would quickly accrue through appreciation in value in the inflationary real estate mar-

---

2. The Court asked Karen why she was deeded Olson's homestead and a duplex for no consideration shortly after her marriage. Ms. Strom, who had been a Bank secretary prior to the marriage, responded that she "had always wanted to own real estate". It was somewhat surprising that counsel revisited that testimony during his argument as it did not seem to place the Defendant in a particularly good light.

3. During its development stage, High Site, Inc., was partially owned by Olson and Lawrence Wenzel. Wenzel owned Wenzel Plumbing & Heating, Inc. Olson, of course, owned Olson Furniture.

ket. And, if the owners of the project qualified, substantial tax deductions would flow to its investors, sheltering other unrelated income.

All that with little, and sometimes no, hard capital invested.[4] This was basically Olson's strategy in all of his real estate investments during the 1970s and early 1980s.

In order to successfully employ the highly leveraged investment strategy, it was necessary for the investor to be familiar with bankers and to have ready access to bank loans. Highly leveraged deals by their very nature occasionally needed infusions of cash to keep them going. The cash was usually obtained in funds borrowed from banks.

Olson was aware of this. Among his other business endeavors, he was an independent contracting financial consultant to banks on problem commercial loans. Olson was in the business assisting concerned, pressured, harassed and often times embarrassed bankers in salvaging imprudently made loans gone bad. Inflationary real estate markets typically spawn numerous such loans. What better way for the investor to become familiar with bankers and to position himself for ready access to bank loans?

In the Fall of 1974, Olson recognized an opportunity that might provide him a highly leveraged position in a new development and, at the same time, a large amount of cash to shore up his existing highly leveraged investments. Palatine Bank had a bad loan that concerned its president and directors, and the Bank consulted with Olson about it. The loan was in the form of a note in the amount of $300,000.00 owed by borrowers named Edgar and Rintz. The note had been in default for some time. The Bank would be required to write it off on its books and incur the loss for 1974 if something was not done about it before the end of the year.

Edgar and Rintz had been involved in a potential real estate development project that Olson believed would be highly profitable if actually built. Olson wanted to obtain a leveraged position in the project and saw the defaulted note as the key. If he could acquire the note, he could replace Edgar and Rintz in the project and have his leveraged position. Thus, Olson would propose that he personally become Palatine's solution to the bad loan.

But there would be more to the transaction. Olson proposed to the Bank that as consideration for purchasing the note (and specifically for the risk of its uncollectibility) Palatine would furnish Olson, and the entities he was associated with, a line of credit totalling approximately $1,300,-000.00. The proposal was formally made by letter on December 31, 1974, and was accepted by the Bank on the same day. It called for purchase of the Edgar and Rintz note by Olson with proceeds from the line of credit. The remaining line would be loaned by the Bank in designated amounts to various entities that Olson was associated with. The line was to be completely disbursed no later than January 15, 1975, through six separate loans.

The disbursal was timely made. Olson had his leverage opportunity with nothing down, and he had obtained a substantial amount of cash to service his existing interests and business associates.

FDIC conducted its routine audit of the Bank a short time later. Olson and Palatine had hoped that the structure of the loans would conceal Olson's beneficial interest in them. But from the abundant information in the Bank's file, the auditors readily identified his interest and classified all loans as substandard and as overline.[5] Palatine was instructed to recall the loans and it attempted to do so.

Not surprisingly, the funds had already been spent. The Bank had exchanged a

---

4. Olson purchased his initial shares in High Site, Inc., with a $15,400.00 note. The corporate records do not disclose any significant capital contribution by Olson, or even subsequent payment of the note.

5. Palatine could not legally lend to companies that Olson owned, or that he was associated with, (directly or indirectly) more than a total of $300,000.00 as the loans were structured. The loans were unsecured.

$300,000.00 bad loan for what would soon become a $1,300,000.00 worse one. Although in 1975, the loans were all kept current, in January of 1976, five of the six loans abruptly went into default. When FDIC examiners returned for their annual audit in March and discovered the defaults, the Bank was ordered to charge off all five and take the loss.

Willis A. Glassgow, then president of Palatine, would later write that: "The situation at the time was, of course, extremely critical for both Mr. Olson and Palatine National Bank".[6] Although not acknowledged in the Bank records, the situation was undoubtedly also extremely critical for the Bank's Board of Directors. After the 1975 audit, faced with the possibility of personal liability for the loans, the directors voted not to approve them.[7] But by then the loans had already been made and the proceeds disbursed, presumably with the Board's knowledge and silent acquiescence.

Perhaps it was the critical nature of things in March of 1976, that best explains the subsequent conduct of the Bank. Palatine offered Olson two alternatives: (1) pay off the loans; or (2) bring the accounts current and substitute other collateral and borrowers so as to remove the conditions that triggered classification of the loan as substandard in 1975. The first alternative was, of course, impractical and one that the Bank knew was highly unlikely to occur. Palatine pressured for the second.

The second alternative seems innocent enough upon first consideration. But, assuming Olson could not obtain funds to pay off the loans, he was hardly in the position to substitute other borrowers and collateral

to make them FDIC conforming. There was only one way he could meet that demand. He would have to bury evidence of his interest in, and associations with, the various entities involved in five of the loans, making them appear to be FDIC conforming.

Palatine was aware of this.[8] The Bank not only approved of it, but insisted on it. Thus, under the watchful eye of Palatine, Olson began, in June of 1976, to bury evidence of his investment interests with the creation of the Olson Children's Trust. By March of 1978, when much of the burial had been completed, Glassgow, still president of Palatine, wrote: "To Whom It May Concern … *Mr. Olson has made arrangements and/or sold* interests that he or his various companies held in various real estate ventures …"[9]

When Olson obtained the loans on December 31, 1974, both he and Palatine had hoped that they were structured sufficiently to avoid the discovery by FDIC of Olson's common beneficial interest. After the discovery in March 1975 and through at least March of 1978, Palatine and Olson conspired to defraud FDIC into reclassifying the loans, and to defraud potential other lenders who might directly or indirectly take them over.[10]

When it finally became evident to Palatine that the loans would not be reinstated or refinanced elsewhere, the Bank turned on Olson and his entities with state court collection litigation. At that point, Olson buried most of the few assets that were still exposed (his homestead and other insignificant miscellaneous real estate) by conveyances to Strom, and dug in to resist

6.  *See* Exhibit K.

7.  *See* Exhibit 1.

8.  *See* Exhibits 17 and K.

9.  *See* Exhibit K (emphasis added). The phrase "has made arrangements and/or sold" betrays the Bank's knowledge of this intrigue, and the letter itself suggests Palatine's participation in it. *See* Footnote 10, *infra.*

10.  The purpose of Exhibit K was not explained at trial. The document is a letter addressed "To Whom It May Concern", prepared on the Bank's

letterhead and signed by Glassgow as President. The document discusses the history and status of the loans, posturing both the Bank and Olson in the most favorable light that could be gleamed from the transaction. Absent some other plausible explanation, it can only be assumed that the letter was authored by Palatine to assist Olson in obtaining financing somewhere else to pay off the Bank and extricate it from the mess. Apparently, Glassgow so testified in state court litigation. *See* Exhibit 1 at page 729.

and delay the Bank. In early 1979, the burial was finished with the "sale" of the Carlton stock to Strom for the price he had recently paid for it, $500.00.

The Court litigation was slow going. Palatine found itself mired in the muck it had helped create through its past dealings with Olson. Judgments were ultimately obtained on four of the notes upon consolidated jury trial against Olson and some of his entities. Appeals were taken and the Minnesota Court of Appeals affirmed the judgments by decision issued in May 1985.

Post-judgment collection proceedings were ongoing at the filing of Olson's bankruptcy petition. But by the spring of 1985, as Palatine knew, assets having any equity had been long since liquidated through Olson's Byzantine empire, with the proceeds directed elsewhere than in satisfaction of the Bank's debt. Palatine had become a victim of its own prior conspiracies with Olson.

Olson probably had no expectation of ultimately avoiding the Palatine debt; nor is there any indication in the record that avoidance was ever his purpose. He intended to pay the debt, but the Bank could wait. From mid-1978, Olson had other more immediate uses for whatever equity he could squeeze out of his investments.

There was the Carlton Bloomington Dinner Theater, being developed through Strom. A typical Olson blueprint project in one respect, the Carlton development was nearly 100 percent leveraged. It was the dream project that Olson knew would solidify all of his leveraged fortunes and pay off his creditors, including, in time, Palatine. Olson viewed the development as a gold mine, a sure thing, a guaranteed success in the making.

But in 1979, he needed time to develop the project free from Palatine's interference; and, just as importantly, he needed his other investments to make it happen. That meant that Palatine had to be delayed. Olson's Byzantine empire was not created to delay or hinder Palatine. But ultimately, it served that purpose very well.

## IV.

## WHERE ALL THE MONEY WENT

While much money can be made quickly in an inflationary real estate market, money can be lost even more quickly. This is especially so with highly leveraged projects that do not positively cash flow. If the debt service for these projects are tied to fluctuating interest rates, the investments are highly vulnerable and even more speculative.

In a financial statement prepared by Olson as of July 31, 1975, he boasted a net worth of $5,095,300.00. (Exhibit 86). By June 30, 1983, the Olsons jointly claimed a net worth of $11,643,890.00. (Exhibit 105). As of November 1, 1984, Kenneth published a negative net worth of $1,210,341.00, and Karen listed a negative of net worth of $123,026.00 (Exhibits 51 and 49). By September 30 of that same year, the Carlton Dinner Theater, which was the only significant operating project and investment left, published a negative net worth of $1,880,120.00. (Exhibit 47). What happened?

Olson was not asked to explain the dissipation of assets and equity recorded on numerous personal financial statements and financial statements of entities he owned or controlled from the early 1970s to October 1986. The statements themselves, mostly prepared by Kenneth Olson, are questionable both in form and substance. Inconsistencies abound, and the information is, for the most part, wholly unsubstantiated.

Nevertheless, the documents, together with other exhibits suggest the answer. It is unlikely that much of the equity claimed in the numerous financial statements ever existed in any tangible form. Most of it was blue sky leveraged on borrowed money.

High Site, Inc., is a good example. Olson's initial purchase of stock in the corporation was paid with a $15,400.00 note. The corporate records (Exhibit 41) do not reveal whether the note was ever paid. In June of 1972, Olson and Lawrence Wenzel (another shareholder) bought out the other

three shareholders. They purchased the shares with notes to the selling shareholders in the total amount of $36,500.00, representing repayment of funds advanced by the sellers during their relationships with the corporation. Additional provision was made for a contingent payment to each, his initial investment of $12,500.00.

Two years later, Olson published his equity position in High Site, Inc., as 50 percent owner, at $465,000.00. (Exhibit 85). The corporate records do not provide any information that would tend to explain this appreciation.[11] By July 31, 1975, Olson was sole shareholder of High Site, Inc., and claimed an equity position of $440,000.00 at a "cost" of $88,000.00.

As of July 1975, Olson had been "in real estate" for no more than 10 years, probably no more than five as a serious "investor". Most of his projects, separate from the furniture business-related holdings, were lodged in two corporations wholly owned by him known as: "Olson Properties, Inc." and "Olson Companies, Inc." In his July 31, 1975, financial statement, Olson published his equity position in these entities as totalling $3,241,000.00 at a total "cost" of $130,000.00. (Exhibit 86).

The Palatine transaction is further evidence of a blue-sky empire leveraged on borrowed funds. The approximately $1,000,000.00 fresh cash loaned by Palatine in January of 1985 was used:

A. $264,000.00 ostensibly loaned to Watson Construction Company was really a payment to Watson in satisfaction of a mortgage on Olson Real Estate. Olson was obligated to repay the loan.

B. $249,835.00 ostensibly loaned to Olson's Planned Interiors, Inc., was really payment to it on accounts owing by High Site, Inc., and another project in which Olson held an interest, for carpet material furnished the developments. The projects were obligated to repay the loan through Interiors.

C. $235,000.00 was ostensibly loaned to Olson's accountant to purchase the stock of an Olson owned development project. The purchase was a sham and the record does not disclose what the proceeds were actually used for.

D. $250,000.00 ostensibly loaned to Wenzel Plumbing and Heating, Inc., for business purposes was really used in connection with an Olson/Wenzel project, probably the development High Site Manor. (See Exhibits 13 and 14).

From the record, it appears that the relatively little equity that was ultimately realized on his investments was used by Olson to satisfy short-term obligations of the Carlton Dinner Theater.[12] The Carlton project was grossly and fatally undercapitalized from its inception. Its consistent and substantial negative cash flow long foretold of its inevitable demise.

A typical Olson project in at least one respect, the Carlton was virtually 100 percent leveraged. While Olson, through Strom, held an interest in the underlying real estate, the stated value of that interest assumed a viable, healthy and successful development that never existed. It was at

---

11. The corporation's main assets were a vendee's interest in a contract for deed on an apartment building in Eagan, along with undeveloped real estate. The records do reflect substantial development activity regarding a project that was to become known as "High Site Manor", but that was actually done by Wenzel and Olson under a separate partnership. High Site Manor was separately accounted for and valued by Olson in his 1974 and 1975 financial statements. (Exhibits 85, 86, and 87.)

12. High Site Manor was refinanced in July 1984, making available to Olson approximately $900,000.00. It was sold by Contract for Deed

on October 26, 1984. Two banks were paid a total $1,835,951.45 on Carlton-related debts out of the proceeds received at closing. An additional $117,473.55 was available to Olson, who testified that all funds were used to pay operating expenses of the Carlton. A Contract for Deed on another project in which Olson had a beneficial vendor's interest was discounted and liquidated by the vendors in February 1985. Olson's share of the proceeds, $750,000.00, was, according to testimony at trial, used for Carlton operating expenses. Apparently, all other significant investments either ended in foreclosure or bankruptcy.

all times before development of the project, during its operation, and after its failure, grossly overstated. The record reveals no significant cash capital contribution, as such, made to the Carlton project initially.[13]

The Carlton was different from Olson's other projects, in that, from its inception, the operation sustained substantial loss and deep negative cash flow. The dinner theater opened in September of 1980. It closed during the pendency of its Chapter 11 reorganization case on July 1, 1987. A September 30, 1984, Carlton balance sheet starkly revealed the fatal condition of the project even then. Current liabilities were listed on the statement at $1,126,576.00. Current assets, which are normally used to pay current liabilities, were listed at $261,988.00. The resulting inability to pay stated current liabilities without either partial liquidation or outside cash infusion was $864,588.00.

Not listed as current liability was $1,105,835.00 in existing service liability on advanced ticket deposits, gift certificates and coupon receipts. That money had been spent, presumably on operating expenses. If the advance sale receipts were included as current liability, the shortfall of available cash needed to pay current expenses was $1,970,423.00.

According to operations statements from 1980 through September 30, 1984, attached to the balance sheet, the Carlton had sustained a total loss of $2,939,019.00. Of that amount, $1,209,222.00 was depreciation. The balance, $1,729,797.00, was in real dollars that directly impacted cash flow. This profuse financial hemorrhaging continued for another three years before the project was shut down.

What happened to Olson's net worth? Much of his stated net worth was blue sky never realized. The relatively little net worth that was ultimately squeezed out of his projects was likely cast into the big black hole known as the Carlton Dinner Theater and forever lost.

V.

## PARTIAL FAILURE OF THE EVIDENCE

■ It has not been shown by clear and convincing evidence that Olson's debt to Palatine was incurred through fraud, rendering it nondischargeable under 11 U.S.C. § 523(a)(2)(A). In fact, none of the essential elements of nondischargeable fraud has been proven. Palatine complains that the purpose and nature of the loans creating the debt were misrepresented to it by Olson in December 1974. A more likely scenario is that Palatine understood that the loans were for Olson's benefit at the time of the transaction, and that it did not care how the funds were to be used. It viewed the transaction as a solution to a bad $300,000.00 loan and as an opportunity to lend more money at a good rate of return to what it considered to be a solid credit-worthy borrower. Attempts to defraud were initially directed at FDIC, and later at potential third-party lenders who never materialized. Palatine was never a victim of that fraud, but was likely a participant in it.

■ Similarly, it has not been shown by clear and convincing evidence that Olson, within one year prior to the filing of his petition, transferred, concealed or removed property with the intent to hinder, delay or defraud Palatine. The record is insufficient to justify a bar of Olson's discharge under 11 U.S.C. § 727(a)(2)(A). Any attempt by Olson to hinder and delay the Bank occurred outside the year immediately preceding the filing. Palatine was aware of the transfers and concealments for at least a year prior to the filing (and probably much longer) both from its own prelitigation involvement with Olson and, later, through its state court litigation to establish and collect the debt.

---

**13.** A balance sheet as of September 30, 1984, shows $1,863,540.00 as "Paid In Capital". However, no stock was ever issued for any such contribution and it is not clear what the stated figure represents. The real estate itself was being purchased on contract for deed, the downpayment for which was funded with proceeds of a loan secured by placement of a first mortgage on the property.

■ Documents cannot "speak for themselves" so as to justify a bar of discharge under 11 U.S.C. § 727(a)(5) for failure to explain the dissipation of assets and equities. Due process requires that a debtor must first be asked to explain those particular matters for which explanation is sought; and then, he must have either refused to explain or have furnished insufficient explanation. A § 727(a)(5) cause of action is not a substitute for cause of action based on alleged prepetition fraud, conversion or other malfeasance. The purpose of the action is to deprive discharge to a debtor who refuses to cooperate with efforts of the trustee or creditors to trace property, to locate and to recover assets of the estate. Accordingly, there can be no "documents case" which, standing alone, would be sufficient to bar discharge under § 727(a)(5). It has not been shown that Olson failed to satisfactorily explain the dissipation of his assets and equities prior to filing, as it has not been shown that he was asked to explain these matters and either refused to do so or furnished inadequate explanation.

## VI.

### WHY OLSON MUST BE DENIED DISCHARGE

■ The documentary evidence, together with the brief testimony at trial, is clear and convincing to the Court of two things. One is that Kenneth Olson, not Karen, was the architect of the Byzantine empire involving: High Site, Inc.; High Site Properties; Olson Properties, Inc.; Olson Companies, Inc.; Metropolitan Creative Marketing, Inc.; Olson Motor Lodges, Inc.; the Olson Children's Trust; South West Properties; and the Carlton Bloomington Dinner Theater, Inc. The other is that Kenneth, not Karen, controlled the various properties connected with those entities and connected directly with Karen; and, despite the forms of the entities themselves, Kenneth held a substantial beneficial interest in the properties and projects that were from time to time assigned to them.

The pretense of no interest, created and maintained prepetition, was not left by Kenneth outside the sanctuary of bankruptcy. Unfortunately, he crossed the threshold into that sanctuary still playing the charade. Kenneth failed to disclose his beneficial interest in the Carlton project, either at filing or during pendency of the case. He knowingly and fraudulently gave a false account and false oath in his schedules. Olson repeated the false oath later by his testimony at trial that he simply was disinterested in the project, sold his stock in the Carlton Bloomington Dinner Theater to Karen for $500.00 prior to its development, and was thereafter not beneficially involved. The testimony is not credible, and every reasonable inference that can be drawn from the documentary evidence refutes it.[14] While a transfer might have occurred in form, it had no substance.

The value of Kenneth's beneficial interest in the Carlton at filing of his petition is questionable.[15] But denial of discharge un-

---

**14.** In fact, the claim is preposterous. Every cent that Kenneth had, ultimately went into the Carlton after the purported transfer. *See* Footnote 12, *supra.* Kenneth, not Karen, arranged all financing. Actual and prospective lenders dealt with Kenneth as the responsible person and looked to him for payment in connection with the project. Karen had no significant monetary investment in the project, was without any significant experience in the development and operation of such projects, and had no independent credit worthiness of the kind required for the participation of lenders. Aside from miscellaneous decorating decisions, every indication from the record and documents in this proceeding is that Kenneth controlled the project in concept, development, and operation.

**15.** At the time of the claimed transfer of his Carlton stock to Karen, Kenneth was a 50-percent shareholder. The land upon which the Carlton sits was being purchased by the corporation under contract for deed. Shortly after the transfer of his shares, Kenneth had Karen purchase the other shareholder's interest for $500.00. He then caused the corporation to assign its interest in the real estate to her, individually. It was then leased to the corporation, which operated the dinner theater. When she filed her Chapter 11 petition on January 20, 1987, Karen valued the real estate at $15,350,000.00 with total liens against it scheduled in the amount of $3,220,230.00. She also scheduled, as an asset, the value of a long-term lease to the Carlton at $3,545,045.00. Total assets were listed at $19,288,928.35, with total liabili-

der 11 U.S.C. § 727(a)(4)(A) is not determined on the basis of a dollar value of property concealed by false account and false oath.

The Bankruptcy Code allows the forgiveness of many prepetition financial transgressions of a debtor. But neither the Code nor the Courts charged with adjudicating proceedings arising under it, tolerate dishonesty of a debtor in connection with the filing or administration of a bankruptcy case. It is because Kenneth Olson continued to play the charade in connection with the filing and administration of his bankruptcy case, that his discharge must be denied under 11 U.S.C. § 727(a)(4)(A).[16] The very integrity of the bankruptcy system and process demands it.

## VII.

### DISPOSITIONAL ORDER

ACCORDINGLY, IT IS HEREBY ORDERED:

1. Defendant's motion for judgment on failure of the Plaintiff's evidence regarding its causes of action under 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 727(a)(2)(A) and 11 U.S.C. § 727(a)(5) is granted.

2. Defendant's motion for judgment on failure of the Plaintiff's evidence regarding its cause of action under 11 U.S.C. § 727(a)(4)(A) is denied.

3. Plaintiff is entitled to judgment that Defendant be denied his discharge otherwise provided for under 11 U.S.C. § 727, by reason of § 727(a)(4)(A) for giving false oaths and making false accounts in connection with the bankruptcy case.

Let Judgment Be Entered Accordingly.

ties listed at $4,224,231.00. The value assigned the real estate is not substantiated in the record of this proceeding and is probably overstated. In fact, the real estate has been foreclosed pursuant to relief from stay granted in the Strom bankruptcy. The redemption period expires in September of this year. No redemption has been made. The Carlton corporation, which

filed Chapter 11 on June 13, 1986, scheduled assets of $3,010,411.00 and liabilities of $4,762,-507.00.

16. The circumstances of this case would prevent discharge under § 727(a)(2)(B) as well, but that section was not argued by Plaintiff.