In re Vernon E. STRAUB, Debtor.

Cecilia STRAUB, Plaintiff,

v.

Vernon E. STRAUB, Defendant.

Bankruptcy No. 95–30506.
Adv. No. 95–7057.

United States Bankruptcy Court,
D. North Dakota.

Feb. 22, 1996.

David Senn, Dickinson, ND, for Plaintiff.

Robert Keogh, Dickinson, ND, for Defendant.

Wayne Drewes, Chapter 12 Trustee, Fargo, ND.

## OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff commenced the above-captioned adversary proceeding by Complaint filed August 25, 1995, seeking to have an obligation stemming from a monetary judgment entered by a state court in connection with the parties' divorce declared nondischargeable pursuant to §§ 523(a)(4), (a)(6), and (a)(15) of the Bankruptcy Code. Additionally, she asks that the debtor be denied a discharge generally pursuant to § 727(a)(5). Trial was held before the undersigned on February 6, 1996.[1]

### *Findings of Fact*

#### 1.

The plaintiff Cecilia Straub (Cecilia) and the debtor/defendant Vernon Straub (Vernon) were divorced by Judgment entered on October 25, 1984, by the North Dakota District Court, Stark County. After trial the divorce court made detailed findings, providing, by separate paragraph, for child support, rehabilitative alimony and division of property. The court specifically noted Vernon's pre-nuptial acquisition by contract for deed of an interest in 640 acres as well as acquisition of an interest in cattle and machinery. It fixed the value of the marital estate at $97,487.58. Cecilia was awarded items of personal property worth $3,487.58 and, "as a portion of her property distribution," the sum of $21,000.00 which, after an initial payment of $1,000.00 was to be paid over ten years at $2,000.00 per annum with interest at 6%. Vernon was awarded possession and ownership of all other property, both real and personal, free of Cecilia's claims. Following the divorce, problems ensued over Vernon's obligation, necessitating a return to court in 1986 which resulted in an amendment to the divorce decree according Cecilia a lien in all Vernon's real and personal property to the extent of her property division. At trial, Vernon claimed not to have been

---

1. In a related proceeding, the debtor seeks to avoid a judicial lien imposed ·by the divorce court. This motion is treated by separate order.

aware of Cecilia's judicial lien—an assertion which is hardly credible owing to the fact that he appeared with counsel at the hearing before the state district court on July 13, 1986, resulting in imposition of the judicial lien. He is presumed to be aware of that which is contained in the amended judgment. In a further effort to collect the property settlement, Cecilia moved for a monetary judgment on the unpaid property settlement and by judgment entered April 18, 1995, was granted judgment against Vernon in the sum of $35,815.00 together with interest thereafter at the rate of 12% per annum. It is this monetary judgment that serves as a basis for Cecilia's complaint.

### 2.

At the time of the divorce in 1984 the parties were engaged in a farming operation in Grant County, North Dakota maintained on land being purchased from Vernon's parents. In 1972 Vernon entered into a contract for deed for the purchase of 160 acres consisting of the home quarter and in 1977 he contracted for the purchase of another 480 acres. The price for the home quarter was $10,000 and $48,000 for the 480 acres. These prices were less than the land's fair market value. In fact, on a North Dakota Rule 8.3 Joint Property Listing prepared in connection with the divorce, Vernon estimated the value of the home quarter at $24,000 and that of the 480 acres $72,000. In a 1985 financial statement made in connection with a bank loan, he put a value of $32,000 on the home quarter.

In 1972 Vernon purchased 15 cows and 1 bull from his parents and by the time of the divorce had built the herd to 39 cows, 17 yearlings, 36 calves and 1 bull. These animals, according to Vernon's 8.3 Statement were worth $20,670 as of July 31, 1984. The parties were also possessed of a full line of machinery at the time of the divorce worth, according to the 8.3 Statement, nearly $25,-000—all paid for. Remaining outstanding on the land contracts was an unpaid balance of $54,964 (home quarter $2,808, 480 acres $52,-156).

In February 1985, just four months after the divorce, Vernon, professing to be unable to continue with the contract for deed pay-ments, quit claimed the 480 acres back to his parents. This was done apparently at the request of his father and without protest on the part of Vernon for reasons soon to be apparent. In 1988 he also quit claimed the home quarter back to his parents, professing at trial to having still owed $2,000 on the contract and another $4,000 for a well. Again, the value of his vendee's interest was of no importance to him, despite having assigned the land a value of $32,000 back in 1985.

After the deed-back, Vernon continued on much as before. He has consistently farmed the 480 acres, cash renting one quarter, share cropping two others and sharing the CRP benefits off another. He has continued to live on the home place, occupying the home and using all the out-buildings rent free with his only responsibility being maintenance and insurance which together costs $440 per year.

### 3.

The livestock, also under somewhat irregular circumstances, wound up in possession of Vernon's parents.

In June 1986 Vernon gave his father a security interest in all his machinery, equipment, supplies and livestock consisting of 37 cows, 33 calves, 10 yearlings, and 1 bull. The consideration for this is for the most part obscure save for a $6,000 bank note his father assumed. By this time the 480 acres had been deeded back leaving Vernon only with the $6,000 due on the home quarter. According to trial testimony, by 1989 Vernon owed his father around $28,000 none of which is represented by any notes. Professing an inability to pay this sum, Vernon gave his parents a bill of sale for 40 cows and 29 calves which, according to a 1989 financial statement, were worth $24,000 in the aggregate. Since then Vernon and his parents have shared the calf crop 50/50.

### 4.

In 1993 Vernon purchased 67.4 acres, borrowing the $10,000 purchase price from his father. According to financial statements prepared for 1994 and 1995, Vernon's assets consisted principally of this acreage worth $10,000 and machinery worth $31,000. In

addition to farming his parents' acreage and the newly acquired acres, Vernon also leases another 980 acres. Since divesting himself of the marital land and livestock, Vernon's net worth has ranged from a high of $49,000 to a negative $3,000 in 1995 which was the first year he listed the unpaid $35,800 property settlement obligation on his financial statements. His gross income derived from farming averaged $22,000 over the years 1987, 1988, 1992, 1993, and 1994. For 1989, 1990, and 1991, which were drought years, it averaged $17,000. Farm expenses over these years, inclusive of all living expenses range from a high of $23,000 in 1994 to a low of $14,500 for each of the three drought years. Vernon's personal living expenses are negligible owing to the fact that he lives on the home quarter essentially for free with his personal expenses, according to Schedule J, totaling $353 per month inclusive of food, home maintenance and alimony (which has not been paid according to Cecilia's testimony). Farm related expenses, according to Schedule J, are $1,687 per month.

On May 24, 1995, a month subsequent to entry of the $35,815 monetary judgment, Vernon filed a petition for relief under Chapter 12 of the Code. The schedules reveal total secured debt of $21,972 comprised of $11,700 owing a bank for operating loans and $8,500 owing to his father. Unsecured debt totals $38,300 of which $35,800 is the property settlement judgment. His Chapter 12 plan proposes unmodified payment of the bank and his father's claims. The unsecured claimants of which Cecilia's is 93% of the total, are to be paid 15% of their respective claims over three years. All machinery and equipment has been declared exempt. The plan projects average income for the years 1995 through 1997 of $25,400 and estimates farm related expenses at $15,400 for each year. After factoring in administrative expenses including attorney and trustee's fees, net income available for plan purposes is projected at $13,000 per year for three years. Payments to secured creditors are calculated at $11,000 for 1995, $9,000 for 1996, and 1997. After four years, all secured claims, save for a revolving operating loan of $2,500 will be paid. Unsecured claimants are to receive $1,900 in the first year, $4,000 in the second

year, and $4,300 in the third, after which these obligations will be discharged. Assuming the unsecureds do receive a 15% pro rata distribution as proposed, it will leave Cecilia with a unsatisfied claim of $26,300. No evidence was produced challenging Vernon's current or projected income and expense figures as inaccurate.

### *Conclusions of Law*

1.

 Recognizing that the one year Statute of Limitations contained within § 727(a)(2) has long since passed as regarding the various asset divestments, Cecilia relies upon § 727(a)(5) as the basis for generally denying Vernon a discharge. Under this section, a debtor obtains a discharge unless "the debtor [fails] to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." The objecting creditor bears the initial burden of identifying the missing assets by showing that the debtor at *a time not remote* in time to case commencement, had assets that would belong to the estate and that on the date of the petition he no longer had those assets. *In re Bernstein*, 78 B.R. 619 (Bankr.S.D.Fla.1987); *In re Piscioneri*, 108 B.R. 595 (Bankr. N.D.Ohio 1989). Once the creditor has produced evidence of the disappearance of substantial assets the burden shifts to the debtor to satisfactorily explain the loss or deficiency. *In re Chalik*, 748 F.2d 616 (11th Cir.1984). A cause of action advanced under § 727(a)(5) is not a substitute for one based upon alleged pre-petition fraud, conversion or other malfeasance. Rather, its' purpose is to deny a discharge to a debtor who refuses to cooperate with the trustee or creditors in their effort to trace property that should have been part of the estate. *E.g. In re Olson*, 98 B.R. 944, 953 (Bankr.D.Minn.1988). The transfers complained of resulting in a perceived loss of marital assets occurred in 1985, 1988, and 1989, all of which are events occurring long before commencement of the Chapter 12 case in 1995. This occurrence is not only too remote in time to come within the purview of § 727(a)(5) but there is no mystery as to what became of the marital assets. Moreover, it appears that despite these

wholesale divestments, Cecilia never advanced a claim of fraud in the state courts and waited until 1995, long after the events had occurred, to obtain a monetary judgment for the unpaid property settlement. Accordingly, her cause of action premised upon § 727(a)(5) fails.

2.

■ Cecilia's complaint is also premised upon §§ 523(a)(4), (a)(6), (a)(15). By all or one of these sections she asks that the debt arising by virtue of the 1995 monetary judgment of $35,815 dollars representing an unpaid property division be declared nondischargeable.

Her argument under § 523(a)(4) must fail. Section 523(a)(4) excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity. Citing *Bush v. Taylor,* 912 F.2d 989 (8th Cir.1990), Cecilia argues that Vernon was her fiduciary as regards the unpaid property settlement and the transfers to his parents violated that duty. In the *Bush* case, the non-debtor spouse was awarded ½ of the debtor's pension benefits as her "sole and separate property." [2] This language was held to impose a constructive trust as opposed to creating a debt. In the case at bar, the divorce court did not award Cecilia specific property other than a few household goods and personal effects. The cash property settlement was specifically in lieu of any other marital property and must be regarded as a "debt" within the ordinary meaning of the word. Vernon cannot be characterized as a fiduciary for its payment.

3.

The efficacy of Cecilia's complaint is found in §§ 523(a)(6) and 523(a)(15). Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another ..."

11 U.S.C. § 523(a)(6).

This court has recognized a cause of action for conversion in a divorce context where the divorce court expressly awarded the non-debtor spouse specific property. In the case of *In re Sateren,* 183 B.R. 576 (Bankr.D.N.D. 1995), the parties were mutually engaged in farming at the time of their divorce. The divorce court specifically awarded the non-debtor spouse one half of the cattle and stored grain as her own property. The debtor, ignoring this award, sold both the cattle and grain retaining the proceeds for himself. This court, in the ensuing § 523(a)(6) action, concluded upon the facts that the debtor had acted with the requisite willfulness and maliciousness to deprive his spouse of a clearly defined and legally enforceable proprietary interest. In the case at bar, as before noted, we are not dealing with an award of specific property. In lieu of such, Cecilia was to receive cash and a lien on all property to the extent of the cash award. The real estate, machinery and cattle were all awarded to Vernon and he was free to do with them as he wished subject only to any outstanding liens and security interests. It is with regards to the judicial lien that Vernon stumbles. Although the voidability of the judicial lien under section § 522(f) is addressed in a companion order, it is important here to point out that in 1988 when Vernon quit claimed the home quarter, worth $32,000, back to his parents it was subject to Cecilia's lien and when in 1989 he gave his parents the livestock worth $24,000 it was also subject to the judicial lien.[3] The livestock along with the machinery was also subject to a security interest given by Vernon to his parents prior in time to the judicial lien. There is nothing in the evidence to suggest Vernon's parents did not advance him money or that the security interest given in June of 1986 was fraudulent in any respect. It must be assumed that Vernon did owe his parents $28,000 and gave him cattle worth $24,000 in recognition of their security interest which did have priority in time over the judicial lien. The quit

---

2. In the recent case of *In re Ellis,* 72 F.3d 628 (8th Cir.1995) the circuit again recognized a distinction to be made between divorce awards of "sole and separate property" and those constituting a division of marital property.

3. At this juncture it is well to point out that § 522(f) renders certain types of judicial liens *voidable* not void *ab initio.* Unless and until action is taken for avoidance and the court acts favorably, a judicial lien remains effective to the extent provided by applicable state law.

claim of Vernon's vendee's interest in the home quarter is harder to reconcile. The vendee's interest was worth at least $22,000 in 1988—enough to satisfy Cecilia's judicial lien yet Vernon made no effort to protect that lien or do anything to preserve the substantial value vested in his vendee's interest. Once divested of legal title, he continued to occupy the property essentially for free.

■ Conversion is any action taken in derogation of the property interests of another. *E.g. Dahlgren & Co., Inc. v. Lacina*, 162 B.R. 267 (Bankr.D.N.D.1993). A "judicial lien" is defined in 11 U.S.C. § 101(36) as a lien obtained by judgment. The term "lien" is defined as including an interest in property to secure payment of a debt. 11 U.S.C. § 101(37). As holder of a judicial lien, Cecilia was vested with an interest in property, the conversion of which is addressable by § 523(a)(6). For it to rise to the level of nondischargeability, the act amounting to conversion must have been both willful and malicious. Willfulness is simply conduct that it is intentional or deliberate. *Johnson v. Miera*, 926 F.2d 741, 744 (8th Cir.1991). Maliciousness requires a heightened level of culpability but does not require a showing of spite nor a subjective intent to injure. *Lacina* at 275. The test is whether the debtor's actions were in fact or should have been recognized as being certain to cause financial harm to the creditor. In 1988 Vernon was possessed of the home quarter worth at least $22,000 after paying off his father. He could have, in recognition of Cecilia's then $20,000 judicial lien, refinanced and held onto the property or, in satisfaction of the lien, he could have quit claimed his vendee's interest to her. He did neither of these things. Rather he gratuitously gave his vendee's interest to his parents but subsequently continued to enjoy all the benefits of ownership including possession. Vernon unquestionably acted in willful derogation of Cecilia's lien holder's interest, acting as he did in contravention to a very clear court judgment. The court also concludes there is no credible explanation for Vernon's actions but that he intended to deprive Cecilia of her lien holder's interest, preventing her from ever foreclosing on the home quarter which, for all

practical purposes, remained his property. The court believes, when considering the evidence as a whole, that the elements of willfulness and maliciousness have been established with the requisite degree of proof to render the property settlement obligation nondischargeable under § 523(a)(6).

### 4.

■ Section 523(a)(15) was added to the Bankruptcy Code by the Bankruptcy Reform Act of 1994 in an effort to enhance the rights of a non-debtor spouse holding a marital property settlement claim. Previously, the rights of marital claimants were limited to § 523(a)(5). Section 523(a)(15) provides as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> > (15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—
> >
> > > (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor ... and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or
> > >
> > > (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15).

This section, by its language, sets up a rebuttable presumption of nondischargeability of any property settlement claim arising out of a divorce which is not of the kind covered by § 523(a)(5). The non-debtor spouse's threshold burden is to merely show that she had a

divorce-related claim not covered by § 523(a)(5). Once meeting this rather minimal burden, it becomes for the debtor to prove either that he has an inability to pay the obligation in the face of his support and essential business obligations or alternatively, to show that discharging the debt would give him a benefit which outweighs the detriment to the former spouse. *In re Florez,* 191 B.R. 112 (Bankr.N.D.Ill.1995); *In re Becker,* 185 B.R. 567 (Bankr.W.D.Mo.1995). Cecilia has not asked that the unpaid property settlement be construed as alimony under § 523(a)(5) and neither party believes it to be anything other than an unpaid property settlement obligation. Hence, the burden rests with Vernon to prove by a fair preponderance of the evidence one of the two alternatives.

■ As the language is similar, the inquiry under § 523(a)(15)(A) has been treated by some courts as akin to the "disposable income" test found in §§ 1225(b)(2) and 1325(b)(2). This test consists of nothing more than weighing the debtor's income against expenses and determining whether, after allowing for what is reasonably necessary for support and business operations, there is anything left over. There is a distinction to be made, however, between a § 523(a)(15)(A) analysis and that made under the related Chapter 12 and Chapter 13 provisions. As invoked in § 1225 and § 1325, the Code is addressing confirmation of a plan— not dischargeability. Moreover, both sections establish clear datelines. A court may not approve a plan unless, as of the *effective date of the plan,* the plan commits all disposable income to be received *over a three-year period* beginning *on the date the first plan payment is due* to making plan payments. Section 523(a)(15) is not addressing plan contributions. It is concerned with whether an obligation shall forever be nondischargeable. It contains no deadlines, dates or measuring points for making an assessment of a debtor's disposable income. In this regard, it is more similar to § 523(a)(8)(B) allowing for the discharge of student loans if their payment would impose an undue hardship upon the debtor and dependents. Some courts have restricted the financial inquiry under § 523(a)(15)(A) to present circumstances

merely looking at the debtor's financial circumstances as they appear in the schedules. If there appears to be no disposable income, the debtor wins. *In re Becker, supra.* In a recent case, the bankruptcy court for the Northern District of Alabama, although utilizing a current income/expense analysis, did question the appropriateness of using a Chapter 13 standard to determine a dischargeability issue noting that as the debtor receives a discharge of significant debt his ability to pay changes. *In re Anthony,* 190 B.R. 433, 439 n. 6 (Bankr.N.D.Ala.1995). The *Anthony* case alluded to the problem which this court believes is better addressed by taking the analysis of the debtor's situation for § 523(a)(15) purposes, beyond his current financial circumstances. In the case at bar, Vernon's Chapter 12 plan over four years will have completely eliminated all secured debt and his only remaining ongoing obligation will be a $2,500 revolving operating loan. If the plan as proposed is confirmed, he will be discharged of all unsecured debt including the property settlement obligation the result being that at the end of four years his disposable income will rise to $10,800! Having received a discharge, he will be home free and Cecilia will have nothing. Can this be the result intended by the framers of § 523(a)(15)(A)? This court thinks not. An analysis of a debtor's financial resources for § 523(a)(8) purposes has always required an analysis reaching beyond the debtor's immediate circumstances even though the statute itself is silent as to any point of demarcation. Courts look to a debtor's long-term financial prospects and seek to determine whether a debtor's present financial inability to pay a student loan will exist on into the foreseeable future. *In re Binder,* 54 B.R. 736 (Bankr.D.N.D.1985); *In re Boston,* 119 B.R. 162 (Bankr.W.D.Ark.1990); *In re Medeiros,* 86 B.R. 284 (Bankr.M.D.Fla. 1988). As with student loans, the inquiry begins with an analysis of the debtor's current financial circumstances, but ends with an inquiry whether that situation is fixed or is likely to change in the foreseeable future. Section 523(a)(15)(A) does not restrict the court's inquiry to a "present" ability to pay the debt nor should it, since to impose or

imply such a restriction would in many, if not most cases, render the provision's objective a nullity. If one's analysis of Vernon's financial ability is restricted to his current situation he does not have the ability to pay the obligation owing Cecilia. But this is a review with blinders and would under foreseeable financial circumstances lead to a preposterous result. Once having satisfied all secured debt and obtaining a discharge of a portion of his unsecured debt, Vernon would continue his ranching operation unimpeded. The farm will throw off after all expenses, disposable income of at least $10,000 per year which is more than sufficient to pay off the property settlement obligation owing Cecilia. After receiving a 15% distribution over the three year plan as proposed, she will be owed $26,300 with interest at 12%. This can be paid off over ten years at a rate of $377 per month. Even a five-year payback of $585 per month would be well within Vernon's financial ability.

In sum, the court believes Vernon has the future ability to pay the debt owing Cecilia from income and property unnecessary to his maintenance or the operation of his ranching business. He has not carried his burden of proof under § 523(a)(15)(A) nor has he carried his burden with regards to § 523(a)(15)(B). It is hard to see how granting Vernon a discharge of the $26,300 unpaid balance would be of greater benefit to him than would the correlative consequences be harmful to Cecilia. Vernon is not shown to be aged, disabled, or ill-equipped to work. He has a cozy living situation paying practically nothing for housing. He has minimal farming expenses and very shortly will own free and clear 67.4 acres worth $10,000. He is possessed of a full line of farming equipment, all of which will be free of liens except to the extent of future operating loans. His future appears fairly bright in a financial sense.

### Conclusion

Based upon the foregoing, it is the conclusion of this court that the unpaid and outstanding money judgment in the sum of $35,815 plus interest as imposed by the North Dakota State District Court is nondischargeable under § 523(a)(15) of the United States Bankruptcy Code. Further, that the same sum is nondischargeable under § 523(a)(6) of the United States Bankruptcy Code.

**JUDGMENT MAY BE ENTERED ACCORDINGLY** in favor of the plaintiff, Cecilia Straub, and against the defendant/debtor, Vernon E. Straub.

**SO ORDERED.**