**In re John C. ZALESKI, Debtor.**

**Bankruptcy No. 97–31369.**

United States Bankruptcy Court,
D. North Dakota.

Dec. 5, 1997.

John Chester Zaleski, Horace, ND, Lowell P. Bottrell, Fargo, ND, for Debtor.

Wayne Drewes, Fargo, ND, Trustee.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This case is before the court to consider confirmation of the Debtor's First Amended Chapter 13 Plan filed November 10, 1997, against which numerous objections have been lodged by five of the Debtor's principal unsecured creditors.[1] All charge that the plan has not been proposed in good faith in that a considerable amount of recently acquired debt was based on the Debtor's fraudulent actions and further, that the Debtor has artificially restricted his disposable income by inflating his monthly expenses with expenditures that are not reasonably necessary for his support or that of his dependents. The matter was heard on November 21, 1997.

#### 1.

#### *The Plan*

The Debtor, age 51, is a resident of Horace, North Dakota, a community fifteen miles south of Fargo. There he resides with his wife and college-age daughter. Presently he is employed by the local newspaper, the *Fargo Forum,* as its editorial page editor earning $50,000 per year. His wife whose income is relevant to the inquiry, makes $35,000 per year. On September 12, 1997, he filed a petition under Chapter 13 listing secured debt of $77,610 comprised principally of a mortgage on his residence and unsecured debt of $134,459.

Through the plan as presently proposed, the Debtor, over three years, will pay the trustee $600 per month. From this sum, approximating $21,000, the unsecured creditors will receive $15,462 which is an 11.5% return. In addition to this plan contribution, the Debtor intends on maintaining his monthly mortgage payment as well as bringing current and maintaining a $292 per month payment on a John Deere lawn tractor and a $416 per month payment on a vehicle lease.

#### 2.

#### *Income and Expenses*

The Debtor's projected disposable income of $640 per month, of which he is contributing $600 to the plan, is dependent upon the dual income of both the Debtor's net monthly income of $3,011 and that of his non-debtor spouse of $2,081. Household expenses, projected at $4,443 contain a number of items which the objecting creditors believe are either extraordinary or unnecessary:

| | |
|---|---|
| Home maintenance and upkeep | $150 |
| Medical and dental | $130 |
| Transportation | $200 |
| Recreation | $ 97 |
| Charitable contributions | $ 50 |
| Life insurance | $ 41 |
| Health insurance | $ 40 |
| Auto insurance | $187 |
| Automobile lease payment | $416 |
| Automobile payment | $145 |
| Concordia College | $560 |
| John Deere tractor | $292 |

In addition to the foregoing, the Debtor, through payroll deductions, pays $27.91 per month on a cancer policy and $15 to the United Way. The Debtor, his wife and nineteen-year old daughter reside in a home situated on an acre of land. The amount set forth for home maintenance is a general figure representative of what the Debtor estimates the expense would be if he had to make repairs or replacements. At present there are no repairs or replacements being undertaken or immediately anticipated. To maintain the homestead's one-acre tract, the Debtor professes to need a new John Deere tractor with a 42" mower deck. This unit cost $10,000 and carries a monthly payment of $292 per month. At trial, the Debtor acknowledged that mowers are on the market for considerably less. His wife testified that lawn care service could be found for $75 per month.

The Debtor and his wife at present share a single vehicle which is a 1996 Chevrolet Blazer leased for $416 per month. Due to the distance traveled each day and the sometimes questionable winter road maintenance

---

1. Fargo Forum Federal Credit Union, Town and Country Credit Union, Gate City Federal Savings Bank, Norwest Bank North Dakota, Ramsey National Bank and Trust.

they both feel it is necessary. Transportation expenses of $248 is the Debtor's estimate of basic transportation expense to and from their respective jobs including gas and wear and tear. It also includes gas for their daughter's car which she uses to commute to a local private college in Moorhead, Minnesota. This expense does not include business mileage of the Debtor's wife who is reimbursed twenty-five cents per mile. Assuming the Blazer and the daughter's car get twenty-five miles per gallon on average and gasoline costs $1.20 per gallon, the family is projecting commuter mileage of 5,000 miles per month. It is not explained how wear and tear can be an expense factor for a leased vehicle.

In addition to making the lease payment on the recently acquired Blazer, the Debtor is also contributing $146 per month on his daughter's vehicle recently purchased for $6,000 on which the total monthly payment is $245 with the balance borne by the daughter. The Debtor's wife acknowledged that reliable college transportation could be found for less than $6,000.

The medical and dental expense of $130 per month is said to be reflective of the family's annual eye care costing $300 to $400 per year and monthly medications for the Debtor's wife and daughter. Other than these needs, this expense was unexplained save for some wisdom tooth work needed by the daughter. Accepting these expenses as accurate accounts for only $93 per month of the scheduled $130. The family is not presently paying for health insurance and the $40 per month scheduled for health insurance is apparently representative of a sum they hope to use some day to purchase dental insurance.

A scheduled auto insurance expense of $187 per month totals $2,244 annually. Why it should be so high for only two vehicles was not explained by the Debtor or his wife. However, placed in evidence was an auto policy effective last fall covering four vehicles. Although the vehicles and their number are no longer the same, that policy covering four similar vehicles and reduced for multi-car and single driver, bore an annual premium cost of $3,868. One may assume a similar policy covering two similar vehicles would cost approximately $2,000 per year.

The expense related to maintaining the Debtor's daughter at a private college raises the particular ire of the objecting creditors. The daughter is a second-year student at Concordia College, a private school costing $13,000 per year inclusive of tuition and books. Agreeably, it is an excellent school but as acknowledged by the Debtor and his wife, both Moorhead State University and North Dakota State University, located in the same community, also provide excellent educations for considerably less. Even with student loans and scholarships and with the daughter residing at home by attending Concordia College there is still an annual shortfall of $4,300 or $358 per month which the Debtor must cover. Although the $560 per month scheduled expense said by the Debtor to be a projection of what the family share will be, it is not reflective of what the actual experience is presently. From evidence produced it appears that the daughter could attend either Moorhead State or North Dakota State University and, by living at home, the Debtor would incur no expenses uncovered by loans or scholarships.

3.

*The Debts*

Until June 1995 the Debtor's outstanding credit obligations were fairly typical and minor. This all changed in June when the Debtor embarked on a spree of unbridled borrowing which the objecting creditors characterize as fraudulent. On June 7, 1995, he borrowed $7,484 from the Forum Credit Union followed in September by another loan from the credit union of $14,500 ostensibly taken for the purpose of purchasing a boat, motor and trailer. The Debtor signed a combination note and security agreement and affixed his wife's signature thereto without her permission. Although the security agreement pledged the boat, motor and trailer as collateral, the property disappeared in the fall of 1996, with the Debtor, evasive in his answers, offering that it might have been stolen or sold but that he was not sure. All he could definitely say was that it "disap-

peared" with no claim being made against his insurance for stolen property.

In December 1995 he again approached the Forum Credit Union for another loan of $15,200 purportedly to purchase two snowmobiles. As with the September note, he forged his wife's signature to the note. Despite being asked to do so repeatedly, the Debtor never brought the titles into the credit union and claimed on the stand to have "lost" one of the titles and now doesn't know where it went. As with the boat transaction, the snowmobiles also "disappeared" sometime in 1996 with the Debtor professing not to know where they are or what happened to them. He did not put in a claim for theft and has not bothered to see if the loss might he covered by insurance. He suspects the boat and snowmobiles were taken by his twenty-three year old son who has been in and out of trouble for a number of years.

In March 1996 he approached the Town and Country Credit Union obtaining a $14,000 loan ostensibly for the purchase of two John Deere riding lawnmowers. The note and security agreement signed by the Debtor offered the mowers as security. In fact, however, the proceeds were not used to purchase lawn mowers. Instead the money was given to his son. Town and Country sought and obtained a judgment in the sum of $14,531 in August 1996.

Undeterred by service of Town and Country's summons and complaint on July 20, 1996, the Debtor approached Gate City Federal Savings Bank on July 22, 1996, and made application for an automobile loan of $14,918 for the purchase of a 1996 Pontiac. The security agreement purports to give Gate City a security interest in the vehicle yet the Debtor did not have title to such vehicle and has never used the proceeds for the purchase of such vehicle. The loan application was false and, in fact, the loan was obtained for the Debtor's son—a fact not disclosed to the lender. Gate City later obtained a judgment in the sum of § 14,000. Less than a month later, on August 22, 1996, the Debtor went to Norwest Bank seeking and obtaining a loan of $10,846. As security he offered the boat, motor and trailer previously purchased back in June 1995 with Forum Credit Union funds. At the hearing the Debtor admitted he did not own the boat, motor or trailer at the time he signed the Norwest security agreement and related financing statement. Norwest obtained a judgment in July 1997.

Town and Country obtained judgment against the Debtor on August 26, 1996. Nonetheless, and still undeterred, on September 9, 1996, Ramsey National Bank was approached for a $15,000 loan to purchase another 1996 Pontiac. As with the earlier Gate City deal, the Debtor did not have title to the vehicle and never did. The proceeds were not used for its purchase. He knew he did not own the vehicle but pledged it anyway assuming he would get the title yet, he never bothered to investigate where the title was nor did he discern that his son had previously pledged the vehicle to GMAC. The proceeds, in fact, were used to pay other debts of his and his son.

Finally, in October 1996, the Debtor sought and obtained an unsecured $4,051 loan from Avco.

Each of the discussed creditors have pursued collection remedies and several have received judgments.

### Discussion

■■■ Section 1325 of the Code requires as a component of confirmability, that a plan be proposed in "good faith." 11 U.S.C. § 1325(a)(3). Because the term itself is not defined in the Code, considerable case law has developed over its meaning and the test to be employed for making a finding one way or the other. The requirement has at its heart the fundamental notion that bankruptcy is intended to afford the honest but unfortunate debtor the opportunity to gain for himself a fresh start; bankruptcy is not meant to reward the dishonest debtor. *E.g., In re Craig*, 195 B.R. 443, 449 (Bankr.D.N.D. 1996). In other words, courts will not sanction use of the Bankruptcy Code to carry out a dishonest scheme. *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982). Our circuit in a series of decisions endeavored to provide contour to the "good faith" concept, saying in *In re Estus*, 695 F.2d 311 (8th Cir.1982), that the analysis

ought to focus upon "whether the plan as proposed constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *Id.* at 316. Following *Estus,* and in the wake of the then newly enacted § 1325(b), the circuit handed down *Education Assistance Corp. v. Zellner,* 827 F.2d 1222 (8th Cir.1987) which modified the former analysis recommended by *Estus.* In *Estus,* the court suggested the analysis be undertaken on a case-by-case basis focusing upon a nonexclusive list of factors:

(1) The amount of the proposed payments and the amount of the debtor's surplus;

(2) The Debtor's employment history, ability to earn and likelihood of future increases in income;

(3) The probable or expected duration of the plan;

(4) The accuracy of the plan statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) The extent of preferential treatment between classes of creditors;

(6) The extent to which secured claims are modified;

(7) The type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) The existence of special circumstances such as inordinate medical expenses;

(9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) The motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) The burden which the plan's administration would place upon the trustee.

695 F.2d at 317.

Following enactment of § 1325(b) the focus narrowed with most of the foregoing factors subsumed by the inquiry inherent to § 1325(b)—that is, whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentations to mislead the court; whether he has unfairly manipulated the Bankruptcy Code. *Zellner,* 827 F.2d at 1227. Although the focus became narrowed, the court in *In re LeMaire,* 898 F.2d 1346 (8th Cir.1990) nonetheless pointed out in its en banc decision that courts should still examine all the circumstances on a case-by-case basis looking not only to the factors relevant to a § 1325(b) inquiry, but also giving consideration to other factors which are best characterized as bearing upon the issue of unfair manipulation of the Bankruptcy Code. This inquiry harkens back to the fundamental purpose of bankruptcy itself. In *LeMaire,* the court said it is appropriate to consider factors such as the type of debt to be discharged and whether it would be nondischargeable in Chapter 7. Also appropriate for examination is the debtor's motivation and sincerity in seeking Chapter 13 relief. Although, as the Debtor points out, the fact that a debt may be nondischargeable in a Chapter 7 should not be a sole focus of the inquiry nor should it be determinative of the issue, the fact that Chapter 13 grants a more liberal discharge (sometimes called a "super discharge") does cause the court to consider the type of debts being discharged and whether they emanate from pre-petition fraud. By the same token, while the duration of payments alone may not be indicative of bad faith, the duration and repayment percentage when gauged against the nature and amount of pre-petition debt may be indicative of a lack of sincerity. In *Noreen v. Slattengren,* 974 F.2d 75 (8th Cir.1992), the circuit, affirming the Bankruptcy Code's determination of bad faith, concluded that abuse of Chapter 13 may be particularly evident in a case where a major portion of the claims to be discharged arise out of wrongful pre-petition conduct and the debtor proposes only a minimal repayment.

Thus, the inquiry involves a review of the debts sought to be discharged, the debtor's likely motivation for filing Chapter 13 in light of those debts and his sincerity in framing his plan as gathered from a review of the § 1325(b) requirements.

By the time the Debtor filed his Chapter 13 petition on September 12, 1997, he had incurred $134,459 in unsecured debt, $96,000 of which was incurred after June 1995. Although none of the objecting creditors have put forth sufficient evidence to satisfy all of the nondischargeability requirements of

§ 523(a)(2)(A),[2] the Forum Federal Credit Union, Town and Country Credit Union, Gate City Federal Savings Bank, Norwest Bank and Ramsey National Bank did present enough evidence to at least satisfy the court that each would have a plausible and quite possibly provable cause of action for nondischargeability under § 523(a)(2)(A) were this case under Chapter 7. Owing to the liberal nature of the Chapter 13 discharge, they will not be able to pursue this remedy and are left with the treatment available to them under Chapter 13. The total of debts bearing at least a colorable § 523 cause of action is $69,000 which constitutes approximately fifty percent of the total unsecured debt. Even after having been pursued by Town and Country to the point of judgment, the Debtor continued to inveigle other lenders, apparently under no compunction about the methods being employed.

■ As previously noted, the fact that a debt may not be dischargeable in a Chapter 7 is not by itself sufficient to show bad faith, it does nonetheless have a bearing upon the issue particularly when a "super discharge" is sought. As recalled by the court in *Le-Maire, supra*, the liberal discharge is given to encourage and furnish debtors a greater incentive to pay their debts. The concept of sincerity is closely related to the approach the debtor takes, through the Chapter 13 plan, to pay the debts that might otherwise be nondischargeable.

■ In the case at bar, the Debtor after retaining what in his view are monies "reasonably necessary" for his maintenance and support and that of his two dependents, offers to pay the unsecured creditors $600 per month over three years for a net return to them of 11.5%. Section 1325(b)(2) defines disposable income as income received by the debtor which is not *reasonably necessary* for the maintenance or support of the debtor or his dependents. Disposable income then, is what is left over after a debtor reserves or holds back those funds reasonably necessary for maintenance or support. The sense of the § 1325(b)(2) definition is not to leave a debtor with unbridled discretion to carve out for himself and family whatever lifestyle they may choose. How a debtor proposes or intends to carry on his post-confirmation lifestyle in the face of the Chapter 13 "super discharge" has a great bearing on the issue of his motivation, sincerity and whether the plan is proposed in the spirit of Chapter 13. Section 1325(b) is to be applied in a way that allows a debtor to "maintain a reasonable lifestyle while simultaneously insuring that he makes a serious effort to fulfill his obligations to pre-petition creditors by eliminating unnecessary or unreasonable expenses." *In re Rybicki*, 138 B.R. 225 (Bankr.S.D.Ill. 1992) *quoting Matter of Jones*, 119 B.R. 996 (Bankr.N.D.Ind.1990). The key term is "reasonable lifestyle." Debtors need not be reduced to poverty and granted, some discretionary or recreational spending is not inappropriate, but courts are loathe to favor kindly expenditures which are for luxury goods or serve to perpetuate a luxury lifestyle. Greater scrutiny of a debtor's proposed lifestyle and his budgetary components is required, where, as here, a fairly high-income Debtor is advancing a plan offering a niggling return to pre-petition creditors through a three-year plan. Although as before noted, the duration of a plan is not by itself indicative of bad faith, it is a factor in gauging the debtor's sincerity where, as here, a three-year plan operates to reduce the return to pre-petition creditors. In the case at bar the Debtor with gross family income of $7,145 per month appears to be carrying on much as he did prior to Chapter 13. The court can see very little serious effort being made to reduce or eliminate those monthly expenses which are not reasonably required for the maintenance of the family. A number of the enumerated monthly expense items are nonessential to the family's maintenance and support and some are best characterized as luxury items.

2. This section of the Bankruptcy Code provides:

    (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Charitable contributions of $65 per month are unnecessary and cannot be said to be essential to the family's maintenance or support. Nor can it be said that a $97 per month set aside for unspecified recreation is indicative of any earnest belt-tightening on the part of the Debtor. A monthly set aside of $40 for a nonexistent dental policy cannot be countenanced as essential either. The automobile insurance seems unduly high for two vehicles and against the four vehicle policy formerly in place, appears excessive by at least $20 per month. The amount set aside for medical and dental expense is unsubstantiated and is excessive by approximately $30 per month. Retention of a lawn tractor worth $10,000 to service a one-acre lot which requires a monthly payment of $292 is best characterized as an unnecessary luxury easily done without. For considerably less than $292 per month work essential to lawn maintenance can be done.

A monthly budget reserve of $150 per month for unspecified home repairs that are not planned is nonessential to the family's maintenance or support. The $200 per month budget item for transportation is unsupported from the facts. As earlier discussed, wear and tear is not a consideration for leased vehicles, leaving $200 for gas and oil-an amount which can only be regarded as excessive, given the length of the daily commute and the fact that the Debtor's wife is fully compensated for any work-related driving she does. Even if the Debtors' daily commuting mileage is 100 miles (which the court views as extremely unlikely) the total monthly mileage would be 3,000 miles. At 25 miles per gallon, 120 gallons of gas would be consumed which totals $144, assuming the price of $1.20 per gallon. Transportation expense is excessive by at least $100 per month.

Despite the Debtor's belief to the contrary, a 1996 Blazer costing $416 per month is an absurd luxury bordering on the lifestyles of the rich and famous rather than the reasonable lifestyle of a Chapter 13 Debtor. It is wholly unnecessary as the family's vehicle needs, even in a leased vehicle, can be obtained for considerably less. This budgetary item is overstated by at least $100 per month. Blazers, Corvettes, campers and fancy boats have all been regarded by courts as not reasonably necessary expenses. *See e.g., In re Reyes,* 106 B.R. 155 (Bankr. N.D.Ill.1989); *In re Hedges,* 68 B.R. 18 (Bankr.E.D.Va.1986); *In re Rybicki, supra; In re Rogers,* 65 B.R. 1018 (Bankr.E.D.Mich. 1986).

An expensive education at a private school is hardly a basic need of the Debtor or his family, particularly when it appears that a similarly high quality education is available from either of two local state universities. According to the evidence, the daughter's attendance at one of the state's schools would likely cost the Debtor nothing out of pocket, assuming she continued living at home and received financial aid. Accordingly, the $560 per month budgetary item should be stricken.

Other of the Debtor's budgetary components might also be questioned on the grounds of reasonableness such as a monthly food budget of $500 for a family of three. However, from what has been highlighted here it is apparent to the court that the Debtor's budget, reducing thereby his disposable income, is not by any means designed to provide he or his family with what is *reasonably necessary* for their maintenance or support. Quite the contrary, it is designed to perpetuate a fairly extravagant lifestyle in the face of a parsimonious payment to pre-petition creditors who may have claims that would be nondischargeable in a Chapter 7. At a minimum, the monthly budget is overstated by $1,400 which when added to the acknowledged disposable income of $640 would make $2,040 available to satisfy creditors over a three-year plan. After payment of attorney's fees, the IRS and the trustee, there would be $62,000 available for unsecured creditors giving them a return on the dollar of 46%. A five-year plan, while not required under the Code, would very nearly pay off all creditors.

From a totality of the circumstances with particular focus upon the nature of the pre-petition debt and the Debtor's projected disposable income, the court finds that the plan presently before the court was not proposed in good faith and, therefore, cannot be con-

firmed. Accordingly, confirmation of the Debtor's First Amended Chapter 13 Plan is DENIED.

**SO ORDERED.**