In re Dennis Neal **WEHR,** aka Dennis N. Wehr, aka Dennis Wehr, Debtor.

Mary Ann Bullinger, Plaintiff,

v.

Dennis N. Wehr, Defendant.

Bankruptcy No. 02–31166.
Adversary No. 02–7063.

United States Bankruptcy Court, D. North Dakota.

April 1, 2003.

**394**

Maury C. Thompson, Bismarck, ND, for Debtor.

Kip M. Kaler, Fargo, ND, trustee.

## MEMORANDUM ORDER

WILLIAM A. HILL, Bankruptcy Judge.

Mary Ann Bullinger and Debtor Dennis Neal Wehr were divorced in August 1997. Bullinger commenced the above-captioned adversary proceeding by Complaint filed November 5, 2002, seeking a determination that obligations stemming from a settlement agreement entered in connection with their divorce is actually in the nature of alimony, maintenance or support, and therefore nondischargeable under 11 U.S.C. § 523(a)(5). Alternatively, she requests that the obligation be determined nondischargeable under 11 U.S.C. § 523(a)(15). By Answer filed November 25, 2002, Debtor Dennis Wehr argues that the obligations are dischargeable.

Trial was held on February 27, 2003. From the evidence presented, the court finds the material facts to be as follows:

## I. FINDINGS OF FACT

The parties married in September 1987. Both had been married twice before, and no children were born of the marriage.

During the 1980s, Wehr owned a business, Wehr Nissan and Broadway Auto Sales. At a date not specified by the evidence but during Wehr's period of business ownership, Bullinger loaned Wehr money for his business from an inheritance she received upon her father's death. In 1991, Wehr filed for bankruptcy relief and discontinued his car sales business.

On October 1, 1992, Wehr executed two promissory notes in favor of Bullinger relating to the inheritance money she had loaned him for his business prior to his bankruptcy. One of the promissory notes was in the amount of $8,900.00 and due on October 1, 1995. The second promissory note was in the amount of $26,200.00 and due on October 1, 1997.

The parties divorced in August 1997. The settlement agreement entered in connection with the parties' divorce canceled the promissory note in the amount of $8,900.00 in exchange for a 1929 Buick which Bullinger received. The promissory note in the amount of $26,200.00 remained in effect pursuant to the settlement agreement which stated in relevant part:

> [Wehr] agrees to secure payment of this Note by naming [Bullinger] as beneficiary of one of his life insurance policies to the extent of the face value of the Note. In addition, following completion of the spousal support obligation set forth above, [Wehr] agrees to begin making monthly payments on the Promissory Note in an amount to be determined at that time based on his income and resources. Such payment shall be applied to the interest first and then to the principal.

Ex. 1 at 3. A separate provision in the settlement agreement obligated Wehr to pay Bullinger $350.00 per month as spousal support for a period of 24 months. Ex. 1 at 2. The state court approved the settlement agreement and incorporated it into its Judgment and Decree of Divorce. Ex. 2 at 1.

Wehr made all 24 spousal support payments, and the spousal support obligation ended in September 1999. The first payment on the promissory note was due October 1, 1999, but Wehr failed to make any payment on the promissory note, and Bullinger initiated contempt proceedings in state court. The state court entered an Amended Judgment requiring Wehr to pay $450.00 per month on the promissory note to Bullinger with the first payment due on February 17, 2000. Wehr made

the payments to Bullinger for approximately 20 months. When Wehr again failed to make the payments on the promissory note, Bullinger returned to state court. The state court issued an Order to Show Cause requiring Wehr to appear for a hearing on July 31, 2002, to establish why he should not be declared in contempt of the state court for failure to comply with the judgment and the amended judgment. The hearing was not held, however, because Wehr filed a voluntary bankruptcy petition for Chapter 7 relief on July 30, 2002.

Wehr's bankruptcy Schedule A shows that he does not own any real property. His amended Schedule B lists the following personal property:

| | |
|---|---:|
| Cash on hand | $ 30.00 |
| Checking accounts | 503.00 |
| Security deposits | 220.00 |
| Household goods | 1,570.00 |
| Art and collectibles | 280.00 |
| Clothing | 500.00 |
| Jewelry | 200.00 |
| Golf clubs | 350.00 |
| 1993 Buick (equity) | .00 |
| TOTAL | $3,653.00 |

Wehr's only secured debt is in the amount of $3,400.00 for a car loan. He scheduled two creditors, the Internal Revenue Service and the North Dakota State Tax Commissioner, holding unsecured priority claims totaling $7,960.00. Wehr's unsecured debt totals $57,473.45, which includes Bullinger's disputed $26,000.00 claim.

Bullinger commenced this adversary proceeding seeking a determination that the obligations owed to her by Wehr pursuant to the settlement agreement and divorce decree are nondischargeable under sections 523(a)(5), or, alternatively, under section 523(a)(15) of the Bankruptcy Code.

At the trial on the matter, Wehr conceded that he stopped making payments to Bullinger on the promissory note and on the life insurance policy on which she was named as a beneficiary. He stated that he did not have the financial ability to make the payments on the promissory note to Bullinger or to provide her with life insurance after May 2002, nor does he have such ability currently. The life insurance policy has lapsed, but Wehr stated that the insurance company will reinstate the policy if the $283.00 quarterly payment is made.

When Wehr quit making payments to Bullinger in February 2002, he was working at a car dealership as a salesperson. His 2001 tax return indicates that he made $27,806.00 in wages. Wehr left employment at the dealership in August 2001 because of a disagreement with management. He had a real estate license, which he took out of escrow, and entered the real estate business in approximately October 2001.

Wehr is 73 years old. Although he continues to work as a realtor, he is not sure how long he will be able to work. He considered returning to the car sales business, but ruled out the possibility because he is unable to remain on his feet for the required amount of time.

Wehr's only real estate sale thus far was an older home in Flasher, North Dakota, for $10,000.00. He currently has three properties listed, including: a motel in Steele, North Dakota, listed at $1,300,000.00; a lot on the east side of the Mississippi River listed at $69,000.00; and a restaurant in Bismarck, North Dakota, listed at $129,000.00. Wehr testified that if he sells any of the properties himself, he will earn 3 percent of the sale price as a commission, whereas if another agent sells a property, he will earn 1.5 percent as a commission. Wehr receives $1,612.00 per month in Social Security benefits.

At the time of his bankruptcy filing in this case, Wehr was living with his daughter in Fargo, North Dakota. He had moved from Bismarck to Fargo in June 2002 because he was receiving treatment for skin cancer in Fargo. He lived in

Fargo with his daughter until December 2002 when he moved back to Bismarck. During his six-month stay in Fargo, he did not work.

Wehr currently takes medication for high blood pressure. He testified that his skin cancer has returned, but he has not yet received additional treatment. He recently underwent surgery on his left knee and has been advised that he also needs a hip replacement and a shoulder replacement. Although Wehr is covered by Medicare, he does not have health insurance. He indicated that workers compensation might pay for his hip and shoulder replacement surgeries because both injuries occurred while he was working, but he has not yet applied for coverage. Each of the surgeries will lay him up for four to six weeks.

Wehr receives $1,612.00 per month in social security, and he testified that he does not have any other sources of income, with the exception of the possibility of a real estate sales commission. Specifically, Wehr testified that he does not have a pension or other retirement account. He itemized his current monthly expenses as follows:

| | |
|---|---|
| Rent | $ 450.00 |
| Electricity and heating fuel | 50.00 |
| Telephone | 90.00 |
| Food | 150.00 |
| Clothing | 100.00 |
| Laundry/dry cleaning | 40.00 |
| Medical/dental | 120.00 |
| Transportation | 100.00 |
| Recreation | 150.00 |
| Charitable contributions | 44.00 |
| Health insurance | 83.00 |
| Auto insurance | 93.00 |
| State taxes | 50.00 |
| IRS | 200.00 |
| Auto | 200.00 |
| TOTAL | $1,920.00 |

Ex. 11 at 1. Wehr stated that he is required to have a cellular telephone for his real estate business, but the $90.00 expense includes his cellular telephone bill. He testified that he does not have a washer and dryer in his apartment, and the $40.00 cleaning expense is for dry cleaning his clothing because he does not think using coin-operated machines adequately cleans his clothing. Wehr testified that the monthly budget erroneously lists $83.00 per month for health insurance, stating more than once that he does not have health insurance. His rent is now $425.00 and utilities are between $96.00 and $109.00. Finally, he stated that he incurs expenses related to being a realtor, e.g., advertising and licensing requirements, which are not reflected in the budget. After adjusting Wehr's expenses based on his testimony, his monthly expenses total $1,871.00.[1]

Bullinger is 50 years old. She has lived in her son's home in Bismarck for nearly two years, paying him $400.00 for rent whenever she can. She obtained her high school graduate equivalency degree when she was 19 or 20 and went on to hairdressing school when she was 26. After working as a hairdresser, she worked seven and a half years as a sales clerk at Dayton's, and five years ago began working at Casual Corner. She currently works as an assistant manager at Casual Corner and is paid approximately $320.00 weekly. She does not have any other sources of income. Bullinger's employment at Dayton's provided her with a pension and vested benefits, and her current employment provides a 401(k) retirement plan. She testified

1. This figure does not include realtor expenses because such were not specifically provided to the court. The adjusted total was arrived at by starting with the total expenses as submitted in Exhibit 11, subtracting $83.00 for health insurance and $25.00 for rent, and adding $59.00 for utilities (to bring the total utility expense to $109.00, the high end of the range of his utility expenses).

that the current total value of her retirement accounts is between $15,000.00–20,000.00. Both of her parents are deceased, and she has already received her inheritance.

Bullinger introduced into evidence an accounting of her monthly expenses. They include:

| | |
|---|---|
| Credit card | $ 131.00 |
| Credit card | 65.00 |
| Credit card | 50.00 |
| Casual Corner | 50.00 |
| Utilities | 144.00 |
| Water | 55.00 |
| Cable | 36.92 |
| Telephone | 40.00 |
| Dry cleaning | 40.00 |
| Heart & Lung | 50.00 |
| Mid Dakota Clinic | 50.00 |
| Dental | 25.00 |
| St. Alexius Hospital | 50.00 |
| Life insurance | 84.65 |
| Medical insurance | 105.60 |
| Auto insurance | 50.00 |
| Transportation | 140.00 |
| Food | 250.00 |
| Clothes | 100.00 |
| Rent | 400.00 |
| Entertainment | 75.00 |
| TOTAL | $1,992.17 |

Ex. 10.

## II. DISCUSSION

*A.   11 U.S.C. § 523(a)(5)*

▮ Bullinger first argues that the obligations are in the nature of support and should be excepted from discharge pursuant to section 523(a)(5) of the United States Bankruptcy Code which provides in relevant part:

(a) A discharge ... does not discharge an individual debtor from any debt—

\*   \*   \*   \*   \*   \*

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree

or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

\*   \*   \*   \*   \*   \*

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

11 U.S.C. § 523(a)(5)(B). Thus, three elements must be met for the obligations to be determined to be nondischargeable under section 523(a)(5): (1) the debt must be in the nature of alimony, maintenance, or support, (2) it must be owed to a former spouse or child, and (3) it must be in connection with a separation agreement, divorce, or property settlement agreement. Although the policy underlying section 523(a)(5) favors the enforcement of familial obligations over the debtor's fresh start, *see Williams v. Kemp (In re Kemp)*, 232 F.3d 652 (8th Cir.2000), Bullinger has the burden of proving, by a preponderance of the evidence, that these three elements have been met. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In this case, the second and third elements are not in dispute. The debt on the promissory note and the obligation to maintain life insurance are indisputably owed to Bullinger, a former spouse, and there is no argument that the judgment rendered by the state court was in connection with a separation agreement or divorce decree. Thus, the issue before the court is whether Wehr's obligations to pay on the promissory note and to maintain life insurance are in the nature of support and are therefore nondischargeable under section 523(a).

Whether a particular debt is in the nature of maintenance or support is a question of federal bankruptcy law, not state law, and it is also a question of fact. *Scholl v. McLain (In re McLain)*, 241 B.R. 415, 418 (8th Cir. BAP 1999); *Beach v. Beach (In re Beach)*, 220 B.R. 651, 654 (Bankr.D.N.D.1998). The fact that a divorce decree or stipulation does not call an obligation alimony, support, or maintenance does not prevent a finding that it is such because it is the actual nature of a debt, not its label, that determines whether it is dischargeable. *In re McLain*, 241 B.R. at 418; *In re Beach*, 220 B.R. at 654. The crucial issue in the characterization is the intent of the parties and the function the award was intended to serve. *Adams v. Zentz*, 963 F.2d 197, 200 (8th Cir.1992); *In re McLain*, 241 B.R. at 419 (citing *Boyle v. Donovan* 724 F.2d 681, 683 (8th Cir.1984)); *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 608 (8th Cir. BAP 1997) (citing *Holliday v. Kline (In re Kline)*, 65 F.3d 749, 751 (8th Cir.1995)); *In re Beach*, 220 B.R. at 654. If the function of an obligation is not obvious from the language of the separation agreement or decree, then it is appropriate for the court to examine the circumstances surrounding the creation of the obligation. *McConnell v. McConnell (In re McConnell)*, 88 B.R. 218, 221 (Bankr.D.N.D.1988). Factors to consider in determining whether a debt was intended to serve as an award for alimony, maintenance, or support, or whether it was intended to serve as a property settlement include, but are not limited to:

the relative financial conditions of the parties at the time of the divorce; the respective employment histories and prospects for financial support; the fact that one party or another receives the marital property; the periodic nature of the payments; and whether it would be difficult for the former spouse and children to subsist without the payments.

*Moeder v. Moeder (In re Moeder)*, 220 B.R. 52, 55 (8th Cir. BAP 1998); *see Anderson v. Anderson (In re Anderson)*, 62 B.R. 448, 457 (Bankr.D.Minn.1986) (stating that special emphasis is placed on the facial language of the settlement agreement or decree when considering all the factors). Irrelevant to such inquiry are the parties' circumstances subsequent to entry of the divorce decree. *In re McConnell*, 88 B.R. at 221.

In this case, the language of the settlement agreement may not unambiguously resolve the question of the intended function of Wehr's obligations to pay on the promissory note and to maintain life insurance, but it is illuminating:

[Wehr] agrees to secure payment of this Note by naming [Bullinger] as beneficiary of one of his life insurance policies to the extent of the face value of the Note. In addition, following completion of the spousal support obligation set forth above, [Wehr] agrees to begin making monthly payments on the Promissory Note in an amount to be determined at that time based on his income and resources. Such payment shall be applied to the interest first and then to the principal.

Ex. 1 at 3. By stating that the payments on the promissory note were to *"follow*[ ] completion of the spousal support obligation" (emphasis added), the language of the settlement agreement strongly implies that the parties intended for the payments on the promissory note to be something *other than* spousal support. However, because consideration of the language in the agreement does not render the intended function of the obligations obvious, the court turns to other factors to divine the parties' intent.

If there is a significant disparity in the parties' relative financial position at the time of the agreement and in their ability to generate income in the future, the obligation is highly likely to be in the nature of support or maintenance. *See Holliday v. Kline (In re Kline),* 65 F.3d 749, 751 (8th Cir.1995); *In re Williams,* 703 F.2d at 1057. At the time of the agreement, Wehr worked as a car salesman and Bullinger worked as a sales clerk at Dayton's. Although Wehr earned more income at the time, he also agreed to pay for "all marital debts including his personal debts as well as any debt he incurred in [Bullinger's] name during the marriage and separation[.]" Ex. 1 at 3. Bullinger, on the other hand, agreed to be responsible only for "her individual debt incurred by her since the parties' separation[.]" Ex. 1 at 4. Although the court cannot discern conclusively from the agreement, the marital property seems to have been fairly evenly split. Furthermore, given the 23–year age difference between the parties and Wehr's health problems, Bullinger will likely be able to generate income for many more years than Wehr.

These circumstances and the language of the settlement agreement prompt the court to conclude that Wehr's obligations to pay on the promissory note and to maintain life insurance were not intended by the parties to function as support. In so concluding, the court acknowledges that several courts have held that life insurance obligations which have the effect of providing support and ensuring a home for the former spouse and children in the event of the untimely death of the debtor are nondischargeable under section 523(a)(5) to the extent that they are intended to provide such support. *See Merrill v. Merrill (In re Merrill),* 246 B.R. 906, 916 (N.D.Okla.2000), *aff'd,* 252 B.R. 497 (10th Cir. BAP 2000) (finding obligation to pay life insurance premiums nondischargeable because "the major if not the sole purpose of life insurance is to provide monies to replace the income stream lost upon the demise of the breadwinner"); *Holder v. Holder (In re Holder),* 92 B.R. 294, 297 (M.D.Tenn.1988) (affirming the bankruptcy court's nondischargeability finding on the grounds that the life insurance was necessary to give the former spouse partial assurance that she would receive the support intended by the final divorce decree in the event of the debtor's death); *Guerron v. Grijalva (In re Grijalva),* 72 B.R. 334, 337 (S.D.W.Va.1987) (affirming bankruptcy court determination of nondischargeability debtor's obligation to maintain life insurance because his former spouse and children were completely dependent upon the debtor for support and the family would be left destitute and dependent on public assistance for survival if anything happened to the debtor); *Mesenbrink v. Eiklenborg (In re Eiklenborg),* 286 B.R. 718, 725 (Bankr.N.D.Iowa 2002) (obligation to maintain life insurance for the benefit of minor children nondischargeable where premiums have the effect of providing support for the former spouse and children in the event of the untimely demise of the insured); *Sweck v. Sweck (In re Sweck),* 174 B.R. 532, 536 (Bankr.D.R.I.1994) (holding that the debtor's obligation to maintain life insurance with his former wife as the beneficiary was a nondischargeable support obligation given the large disparity in the parties' earning capacities and the former wife's need for continuing support because of her age and doubtful employability); *Mohn v. Mohn (In re Mohn),* 118 B.R. 51, 57 (Bankr. E.D.Va.1990) (finding debtor's obligation to maintain a life insurance policy on his life was intended to be a "safety net" of alimony and pension payments); *Lineberry v. Lineberry (In re Lineberry),* 9 B.R. 700, 709 (Bankr.W.D.Mo.1981) (finding

that the debtor's obligation to maintain an insurance policy on his life was nondischargeable under section 523(a)(5) based in part on the fact that the insurance was "obviously in the nature of security for payment of support and maintenance"); *cf. Dressler v. Dressler (In re Dressler),* 194 B.R. 290, 298–99 (Bankr.D.R.I.1996) (declining to find nondischargeable a debtor's obligation to maintain life insurance for his children's benefit until they finished attending college).

In this case, the language of the settlement agreement indicating the purpose of the life insurance policy is unambiguous: "[Wehr] agrees *to secure payment of this Note* by naming [Bullinger] as beneficiary of one of [Wehr's] life insurance policies to the extent of the face value of the Note." (Emphasis added.) Because the function of the life insurance policy is directly tied to the function of the payment on the promissory note through the settlement agreement, the court deems the nature of the obligations to be similarly tied. *See Klayman v. Klayman (In re Klayman),* 234 B.R. 151, 153 (Bankr.M.D.Fla.1999) (finding that a debtor had a nondischargeable obligation to procure life insurance in the amount of the outstanding balance on the alimony award, but *not* in the amount owing on the property settlement, where a provision in the settlement agreement required the debtor to maintain life insurance for the benefit of his former spouse until all of his financial obligations to her were satisfied). Thus, the obligations to pay on the promissory note and to maintain life insurance for the benefit of Bullinger are both in the nature of a property award and are not excepted from discharge under section 523(a)(5).

*B.  11 U.S.C. § 523(a)(15)*

■■■  Bullinger also argues that the obligations at issue are nondischargeable pursuant to section 523(a)(15) of the Bankruptcy Code. Section 523(a)(15) provides that a debtor may not except from discharge a nonsupport debt incurred by the debtor in the course of a divorce or separation unless:

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor[.]

11 U.S.C. § 523(a)(15). Thus, section 532(a)(15) excepts from discharge debts that are not for support but that arise out of divorce proceedings, with the two exceptions delineated in subsections (A) and (B).

■■■  In an action to except nonsupport divorce debt from discharge, the nondebtor spouse has the initial burden of proving, both in terms of going forward with the evidence and the burden of persuasion, that the debt owed by the debtor is one incurred in connection with a divorce and is in the nature of a property settlement debt rather than a debt for alimony, maintenance, or support. *Fellner v. Fellner (In re Fellner),* 256 B.R. 898, 902 (8th Cir. BAP 2001). As regards the obligations at issue in this case, Bullinger has met her initial burden of proving that they are nonsupport divorce debts. The court's analysis of the obligations under section 523(a)(5) discusses why the obligations are not in the nature of support and will not be repeated here.

Because the obligations at issue are nonsupport property settlement debts, a rebuttable presumption of nondischargeability is created. *See Moeder v. Moeder (In re Moeder)*, 220 B.R. 52, 56 (8th Cir. BAP 1998). The burden of proof shifts to Wehr to show either that he is unable to pay the debts or that on balance, the debts should be discharged because doing so would result in a benefit to him that outweighs the detriment to Bullinger. *See* 11 U.S.C. § 523(a)(15); *see also In re Fellner*, 256 B.R. at 902–903. If Wehr can prove that either of these circumstances exists, by a preponderance of the evidence, then the debt should be discharged. *See Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Fellner*, 256 B.R. at 903.

### 1. Ability to Pay

An inability to pay exists under section 523(a)(15) if excepting a debt from discharge would reduce a debtor's income to below a level necessary for the support of the debtor. *Mesenbrink v. Eiklenborg (In re Eiklenborg)*, 286 B.R. 718, 722 (Bankr.N.D.Iowa 2002). In making this determination, the court may consider factors similar to those applied in a Chapter 13 disposable income analysis under section 1325(b)(2) because that section's language essentially mirrors the language of section 523(a)(15)(A). *Id.*

In Chapter 13, disposable income is defined as income received by the debtor which is not reasonably necessary for the maintenance or support of the debtor or his dependents. 11 U.S.C. § 1325(b)(2)(A). In other words, disposable income is what is left over after a debtor reserves or holds back those funds reasonably necessary for maintenance or support. *In re Zaleski*, 216 B.R. 425, 431 (Bankr.D.N.D.1997). Section 1325(b) is to be applied in a way that allows a debtor to maintain a reasonable lifestyle while simultaneously insuring that he makes a serious effort to fulfill his obligations to prepetition creditors by eliminating unnecessary or unreasonable expenses. *Id.* Because it is Wehr who bears the burden of proving that he does not have the ability to pay the obligations to Bullinger, it is his burden to show that his expenses are necessary; it is not Bullinger's duty to show that his expenses are unnecessary. *Mesenbrink v. Eiklenborg (In re Eiklenborg)*, 286 B.R. 718, 722 (Bankr.N.D.Iowa 2002). Courts look to a debtor's long-term financial prospects in seeking to determine whether a debtor's present financial inability to pay will continue into the foreseeable future. *Straub v. Straub (In re Straub)*, 192 B.R. 522, 528 (Bankr.D.N.D.1996). The inquiry begins with an analysis of the debtor's current financial circumstances, but ends with an inquiry into whether the circumstances are fixed or are likely to change in the foreseeable future. *Id.*

At trial, Bullinger argued that Wehr's income has been considerably reduced because of Wehr's voluntary change in employment and lack of real estate listings. First, the court deems credible Wehr's testimony that he can no longer sell automobiles because he cannot remain on his feet for the required periods of time—Wehr is 73 years old and has significant health problems. Furthermore, Bullinger presented no evidence that the number and type of Wehr's real estate listings are atypical among realtors, particularly those of Wehr's age and health.

Wehr has monthly expenses of $1,871.00 and a monthly income of $1,612.00 plus any real estate commissions earned. This leaves Wehr with a monthly deficiency of $259.00 before factoring in the obligations at issue. His monthly expenses are by no means extravagant, and he has no available disposable income. He testified that

he does not have the ability to pay the obligation on the promissory note or to maintain life insurance.

Although it is arguably foreseeable that Wehr will sell one or more of his listed properties in the foreseeable future, such does not lead to the conclusion that he will be able to pay the debts in the foreseeable future. First, the court is not convinced that the sale of the property listed for $1,200,000.00 is in any respect foreseeable. Wehr testified that the property had been listed by another realtor before he took over the listing more than one year ago. Because of the length of time the property has already been on the market, it is not reasonable to expect it to sell any time soon. As regards the other two properties, even if Wehr sells them under the most profitable of possible circumstances—selling for the list prices without the buyers being represented by another realtor—he would still be unable to make the payments between the present and the time he received his commissions, and even then he would only be able to pay Bullinger for a short period of time. The court is simply unable to conclude that Wehr's financial circumstances are likely to improve enough in the foreseeable future to enable him to pay the obligations to Bullinger.

Finally, Bullinger did not present any evidence that Wehr owns any property which could be sold to satisfy the debt on the promissory note or to maintain life insurance, nor do Wehr's bankruptcy schedules list any property which could be used for these purposes. After considering the evidence in the record and the testimony presented at trial, the court finds that Wehr has met his burden of proof under section 523(a)(15)(A) by demonstrating that he does not have the ability to pay the debt on the promissory note or

to maintain life insurance from his income or property.

### 2. Benefit to Wehr Versus Detriment to Bullinger

The second prong of the alternative test under section 523(a)(15) requires the court to determine whether the benefit to Wehr is greater than the detriment to Bullinger in discharging the debt. *See In re Fellner,* 256 B.R. at 904. This equitable balancing test must be applied on a case-by-case basis and involves an examination of the totality of the circumstances involved in each case. There is not a fixed laundry list of factors to be considered. *See, e.g., McGunn v. McGunn (In re McGunn),* 284 B.R. 855, 867 (Bankr. N.D.Ill.2002) (considering the income and expenses of both parties; the nature of the debt; the former spouse's ability to pay; the number of dependents; and the reaffirmation of any debts); *Courtney v. Traut (In re Traut),* 282 B.R. 863, 871 (Bankr. N.D.Ohio 2002) (characterizing some of the most important considerations to be the parties' current income, expenses and available assets, and whether the parties have incurred any expenses for luxury goods and services); *Taylor v. Taylor (In re Taylor),* 199 B.R. 37, 41 (N.D.Ill.1996) (considering the amount and nature of the debt sought to be discharged; the conduct of the parties; and the income and expenses of the parties); *Campbell v. Campbell (In re Campbell),* 198 B.R. 467, 475 (Bankr.D.S.C.1996) (considering the income and expenses of both parties; whether the nondebtor spouse is jointly liable on the debts; the number of dependents; the nature of the debts; the reaffirmation of any debts; and the nondebtor spouse's ability to pay); *In re Smither,* 194 B.R. 102, 111 (Bankr.W.D.Ky.1996) (considering the amount of debt and payment terms; all parties' and spouses' current incomes; all parties' and spouses' current expenses;

all parties' and spouses' current assets; all parties' and spouses' current liabilities; parties' and spouses' health, job training, education, age, and job skills; dependents and their ages and special needs; changes in financial conditions since divorce; amount of debt to be discharged; if objecting creditor is eligible for relief under the Bankruptcy Code; and whether parties have acted in good faith in filing bankruptcy and in litigation of section 523(a)(15)). Rather than becoming bogged down by determining which factors should be considered, the court recognizes that the factors are merely tools to use in balancing the financial effect of discharging the debt. *See Fureigh v. Haney (In re Haney),* 238 B.R. 432, 437 (Bankr.E.D.Ark.1999).

In this case, the court concludes that discharging Wehr's obligation outweighs the detriment to be suffered by Bullinger. The parties' standards of living are approximately equal. The evidence establishes a monthly income for Bullinger of $1,386.66 [2] and monthly expenses totaling $1,992.17, leaving her with a $605.51 deficiency. Wehr's disposable income deficiency is $259.00 per month. Thus, the parties both have deficiencies in disposable income. Bullinger is living in her son's home, and Wehr is living in an apartment. Neither has dependants to support. Bullinger drives a 1987 Buick with more than 100,000 miles on it, and Wehr drives a 1993 Buick with 153,000 miles on it. Bullinger has $15,000.00–20,000.00 in retirement, whereas Wehr has no retirement. Weighing in Wehr's favor are his age and health, discussed above, and the nature of the debt. Specifically, the debt on the promissory note is not one that Bullinger will have to assume or repay. Therefore, on balance, Wehr has shown that the benefit of discharging the nonsupport divorce

debts outweighs the detriment to Bullinger if the debts are not discharged.

## III. CONCLUSION

Based upon the foregoing, the court concludes that Dennis Neal Wehr's obligations under the separation agreement entered in connection with their divorce and incorporated by reference into the state court divorce decree to maintain life insurance and to pay on the promissory note are not in the nature of alimony, support, or maintenance, and therefore 11 U.S.C. § 523(a)(5) is not applicable. Further, Wehr has met his burden of proving that he does not have the ability to pay and that the benefit to him of discharging the debts outweighs the detriment to Mary Ann Bullinger under 11 U.S.C. § 523(a)(15). Accordingly, the debts contested herein are deemed to be dischargeable.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**